IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

In re                                    Case No. 07-36735-CGM

LAWRENCE B. SALANDER,

                    Debtor.
_____/

CAROL F. COHEN,

                    Plaintiff,          Adversary Case No.
        vs.

LAWRENCE B. SALANDER,

                    Defendant.
_____/

**ADVERSARY COMPLAINT TO**
**DETERMINE NON-DISCHARGEABILITY OF DEBT**

Plaintiff, CAROL F. COHEN ("Cohen"), through her undersigned attorneys, sues the

Defendant LAWRENCE B. SALANDER ("Salander"), pursuant to 11 U.S.C. §§523(a)(2)(4)

and (6), seeking a determination that the debt owed to Cohen is excepted from discharge.  In

support, Cohen alleges:

## JURISDICTION

1.      Cohen is a resident of Boca Raton, Florida and is *sui juris*.

2.      Salander resides in the State of New York, and is *sui juris*.

3.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1334(b).

4.      This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(I).

5.      Venue is proper in this district pursuant to 28 U.S.C. §1409.

NEWYORK01 1267800v1 230837-000001

## GENERAL ALLEGATIONS

6.     Cohen has long owned a substantial, high-end art collection.  In early 2007, she decided to potentially liquidate a portion of that collection.  Thereafter, in early 2007, she met in New York separately with the famous auction house Christie's, and Salander, who served as President of  Salander-O'Reilly Galleries ("SOG"), to discuss potential liquidation of certain of her art.  After her discussions with Salander and Christie's, Cohen decided that Christie's would sell a very limited portion of her collection, while she and Christie's made a determination on what to do with the rest of the art that Christie's was not then going to sell.

7.     At that time, Salander and SOG were well-known and nationally respected in the fine art field, with Salander having an excellent individual reputation and SOG being known as one of New York City's premier art galleries.  In discussing her art, Salander offered to take custody of and temporarily store Cohen's art that she was contemplating selling, stating clearly he would do so as a courtesy while Cohen and Christie's determined the best method to sell the art.  Based completely on that premise and representation, in the early spring of 2007, Cohen delivered 15 pieces of Cohen's art (the "Artwork") to Salander and SOG which had an approximate value of $3.4 million.

8.     Prior to the Artwork being delivered to SOG, Salander specifically asked Cohen if he could sell the Artwork on consignment, to which she said no, and Salander acknowledged same, which was why Cohen agreed to have him temporarily store the Artwork at SOG.  Notwithstanding, following delivery of the Artwork, on March 15, 2007 Salander nevertheless prepared and tendered a letter on SOG letterhead to Cohen that offered to sell the Artwork on consignment, and which asked Cohen to countersign and return the letter  to Salander.  A copy of the "Letter" with its attendant Schedule of Artwork, is attached hereto as Exhibit A.

9.     Upon receipt of the Letter, Cohen immediately spoke with Salander and expressly reiterated that she did not agree that the Artwork could be sold on consignment and that she would not sign the Letter. Cohen then confirmed with Salander again that he would be merely temporarily storing the Artwork for her, and he agreed to that arrangement. In fact, at no time ever did Cohen sign the Letter, thereby demonstrating there was no consignment agreement as to the Artwork. Thus, as acknowledged in a conversation among Cohen, another witness, Daniel Mielnicki, Esq. and Salander, the game plan for disposition of Cohen's Artwork was that it was going to be stored at SOG while Cohen and Christie's determined the best commercially reasonable method and time to sell the Artwork.

10.     Accordingly, Salander agreed with Cohen that he and SOG would only store the Artwork for her, and nothing more, as he said he had done for other clients of SOG, while it was decided how to sell the Artwork.

11.     Cohen agreed to this arrangement, which seemed reasonable to her given her past experience in having other art galleries temporarily store her art. Further, SOG had both the appropriate facilities to store the Artwork and was physically located near Christie's, so that the Artwork easily could be moved from SOG to Christie's, when it came time to sell it.

12.     Cohen further believed the Artwork would be safe in the custody of the Salander and SOG, because it was then believed that SOG was a nationally well-respected, significant art gallery, located in the prestigious Upper East Side of Manhattan.

13.     In reasonable reliance on Salander's representations about storing her Artwork, Cohen allowed SOG to serve solely as temporary custodian of the Artwork.

14.     At around that same time frame, Christie's sold three pieces of Cohen's Artwork for $2,375,000 listed on the Schedule to the Letter, which are noted as the items that are crossed

off the list of Artwork, and with the proceeds thereafter properly accounted for and remitted to Cohen by Christie's.

15.     SOG remained in custody of the remainder of the Artwork, which had a listed value of $3,417,625.

16.     It turned out that Salander's statements about storing the Artwork were false and constituted misrepresentations of material fact, because very shortly after taking custody of the Artwork, Salander personally oversaw the surreptitious sale of all of the Artwork in his custody as listed on the Schedule to the Letter. He not only failed to disclose same to Cohen, but thereafter, failed to remit any of the sale proceeds to her.

17.     Salander's representations to Cohen about merely storing the Artwork for her were false and Salander knew they were false at the time stated by him. Virtually immediately after his conversations with Cohen, and with Salander's unequivocal knowledge that Cohen expressly refused to sign the Letter, or to otherwise let him or SOG sell the Artwork, Salander personally orchestrated selling Cohen's Artwork.

18.     Unbeknownst to Cohen, and not disclosed by Salander, at the time that Cohen and Salander were discussing storing her Artwork at SOG, Salander and SOG each owed what appears to be up to hundreds of millions of dollars to creditors, much of which was already in default, so Salander had a serious immediate need to get cash any way that he could, which in this case meant lying to Cohen about holding her Artwork, knowing that he was going to and could sell it and give the cash to another creditor, or keep it and hide for his personal use. At the present time, the buyer and disposition of the cash proceeds from the sale of the Artwork is unknown, except that Salander personally orchestrated this fraud and larceny.

19. Salander made these false representations to induce Cohen to give him custody of the Artwork, so that he could sell it behind her back and steal the money proceeds from the sale.

20. Salander had a corrupt intent and scienter to defraud Cohen, evidenced by the fact that: (i) Salander, personally, and his company, SOG, were suffering through serious financial issues starting in at least early 2007, that were not disclosed to Cohen, (ii) the Artwork was sold quickly after it was supposed to be held in storage for Cohen, (iii) at no time after the sale of the Artwork, which was in the first quarter of 2007, did Salander (or SOG) advise Cohen that the Artwork had been sold, (iv) the proceeds of sale were not tendered to Cohen despite the fact the sale occurred about six months earlier, and (v) when a demand for an accounting and statement for information to advise Cohen as to the location of the Artwork was asserted, Salander willfully and totally disregarded same, even as of the filing of this Adversary Complaint.

21. Further, Cohen is informed and believes that Salander and SOG engaged in other similar conduct and victimized others, similar to the circumstances described herein and at the same time, which further goes to prove the issue of Salander's scienter to commit fraud and willful and malicious injury.

22. On September 19, 2007, after counsel for Cohen wrote and telephoned Salander and SOG about this situation, Antoinette Favuzzo, the then Chief Financial Officer of SOG affirmatively admitted the fact of the fraud and theft described above, stating that Salander had handled the transaction and he and SOG had sold Cohen's Artwork *"early in the year and at one time had the cash in its custody, but no longer has the money."*

23. As of the filing of this Adversary Complaint, neither the Artwork nor the proceeds of the sale thereof have been delivered to Cohen, despite demand.

24.     Cohen has been damaged by Salander's misrepresentations and larceny of the Artwork in the amount of at least $3,417,628.

25.     At all times pertinent hereto, Salander was an authorized agent acting for and on behalf of SOG, but acted for his personal benefit, given the dire financial circumstances he faced at the time the acts committed above occurred.

### COUNT I
### Determination of Non-Dischargeability Pursuant to 11 U.S.C. § 523(a)(2)

26.     Cohen realleges paragraphs 1 through 25 as if fully stated herein.

27.     Salander's conduct as alleged with specificity above, precludes him from obtaining a discharge of Cohen's debt pursuant to 11 U.S.C. §523(a)(2) as Salander obtained Cohen's property, being the Artwork, under false pretenses, a false representation or actual fraud.

### COUNT II
### Determination of Non-Dischargeability Pursuant to 11 U.S.C. § 523(a)(4)

28.     Cohen realleges paragraphs 1 through 25 as if fully stated herein.

29.     Salander's conduct as alleged with specificity above, precludes him from obtaining a discharge of Cohen's debt pursuant to 11 U.S.C. §523(a)(4) as Salander committed larceny with respect to Cohen's property, being the Artwork.

### COUNT III
### Determination of Non-Dischargeability Pursuant to 11 U.S.C. § 523(a)(6)

30.     Cohen realleges paragraphs 1 through 25 as if fully stated herein.

31.     Salander's conduct as alleged with specificity above, precludes him from obtaining a discharge of Cohen's debt pursuant to 11 U.S.C. §523(a)(6) as Salander's conduct comprised a willful and malicious injury to Cohen and to her property, being the Artwork.

WHEREFORE, Cohen requests that the Court enter judgment determining that Salander's debt to Cohen is not dischargeable in his bankruptcy, and that the Court grant all such other relief as is just and appropriate.

Dated:  January 30, 2008

Berger Singerman
350 East Las Olas Boulevard
Suite 1000
Fort Lauderdale, FL  33301
954 525 9900
954 523 2872 (Fax)

Charles H. Lichtman, Esq.
Florida Bar No.  501050
Direct Line – 954 712 5138
CLichtman@BergerSingerman.com
      and
Grace E. Robson
Florida Bar No. 0178063
Direct Line – 954 712 5110

and

Troutman Sanders LLP
The Chrysler Building
405 Lexington Avenue
New York, NY  10174
Telephone:  (212) 704-6000
Facsimile:  (212) 704-6288

By: _____
        Amos Alter

Co-Counsel for Plaintiff

945276-1

# EXHIBIT "A"

# SALANDER-O'REILLY GALLERIES, LLC

22 East 71 Street  New York, NY 10021  Telephone 212-879-6606  FAX 212-400-4490

March 15, 2007

Carol Cohen
17308 White Haven Drive
Boca Raton, FL 33496

Dear Carol and Dan –

It was very good to speak with you both.  Following is a list of paintings, drawings and sculptures belonging to Carol which we will offer for sale here on Carol's behalf.  The prices listed represent the asking price less 5% as commission to us on the net prices to you.  I will send you a certificate of insurance with Carol as the loss payee.  The work will be consigned here until May 31, 2007 at which time you will have the option to take back the unsold works or reconsign them to us.  I believe that covers it.

If you have any questions, please do not hesitate to call.  Carol, please let me know if you will be in town.  Julie and I would love to take you to dinner.

If you agree with the terms set forth in this letter, please sign below and return a copy to the gallery.

Thank you both very much.

Sincerely,

Larry Salander


Carol Cohen

# SALANDER-O'REILLY GALLERIES, LLC

22 East 71 Street  New York, NY 10021  Telephone 212-879-6606  FAX 212-400-4490

1. Julio Larraz
   *The Escape*
   1983
   Oil on canvas
   74 x 48 inches                                   $95,000 Net

2. Wilfredo Lam
   *Femme-Cheval*
   1948
   Oil on canvas
   39 ¼ x 31 ¼ inches                               ~~$950,00 Net~~

3. Wilfredo Lam
   *La Chevelure Vegetale (Jungle Comet)*
   1962
   oil on canvas
   39 5/8 x 32 ¼ inches                             ~~$617,500 Net~~

4. Zuniga
   *Domitila*
   1977
   Bronze
   24 ½ x 20 ½ x 18 inches                          $76,000 Net

5. Larry Rivers
   *Camels II*
   1962
   Oil on canvas
   63 ¾ x 51 ¼ inches                               $1,425,000 Net

6. Jean Dubuffet
   *Site Philosophique*
   1974
   vinyl paint on canvas
   80 x 51 ½ inches                                 $712,500 Net

7. Jaspar F. Cropsey
   *Hastings on the Hudson*
   Oil on canvas
   12 ¼ x 20 ¼ inches                               $118,750 Net

8. William Bradford
   *Two Fishermen in a Dory Pulling in Nets*
   Oil on canvas
   18 ¼ x 30 ½ inches                               $118,750 Net

9. Thomas Moran
   *The White City*
   Pencil and watercolor on paper
   18 x 28 inches                                   $95,000 Net

10.  Robert Henri
     *Miss Violet Organ*
     Oil on canvas
     28 ¼ x 20 ¼ inches                    $237,500 Net

11.  Ernest Lawson
     *Inwood, Upper Washington Heights*
     Oil on canvas
     17 ¾ x 21 ¼ inches                    $95,000 Net

12.  Claes Oldenberg
     *Proposal for a Colossal Monument*
     Watercolor on paper
     31 x 24 inches                        $23,750 Net

13.  Fernando Botero
     *Man at Leonor Moyano's House*
     1978
     Oil on canvas
     69 ¾ x 55 ½ inches                    ~~$807,500 Net~~

14.  Fernand Leger
     *Nature Morte a la Lampe*
     Gouache and ink on paper
     25 ½ x 19 ¾ inches                    $190,000 Net

15.  Fernand Leger
     *Femme au Rideau*
     Mixed media
     21 ½ x 18 ¾ inches                    $190,000 Net

16.  Albert Gleizes
     *Composition avec Figures*
     Oil on canvas
     16 1/8 x 13 inches                    $28,500 Net

17.  Andre Masson
     *Abstract Composition and Nude*
     Black chalk on paper
     15 5/8 x 12 inches                    $7,125 Net

18.  Leopold Survage
     *Vaches, Poissons, Etoiles*
     Oil on panel
     13 x 21 5/8 inches                    $4,750 Net